# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY BOYCE (#R-52162), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13 C 5746 |
| v. | ) | |
| | ) | |
| SALEH OBAISI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Anthony Boyce, an Illinois state prisoner, has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Boyce claims that Defendants, correctional officials and health care providers at the Stateville Correctional Center, violated his constitutional rights by acting with deliberate indifference to his safety and medical needs. More specifically, Boyce contends that Defendants failed to take adequate measures to protect him from multiple attacks by fellow inmates, as well as denied him needed medical care following the purported assaults.

Both the correctional staff ("the IDOC Defendants") and health care providers employed by Wexford Health Sources Inc. ("the Wexford Defendants") have filed motions for summary judgment pursuant to Fed. R. Civ. P. 56(a). For the following reasons, the Court grants the Defendants' summary judgment motions and dismisses this lawsuit in its entirety.

## BACKGROUND

### I.     Northern District of Illinois Local Rule 56.1

Boyce's responses to Defendants' motions for summary judgment suffer from a number of deficiencies as required by Northern District of Illinois Local Rule 56.1. Because Boyce is

proceeding *pro se* in this matter, each set of Defendants served him with a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment," as required by Local Rule 56.2 (N.D. Ill.). (R. 163, 154.)   The notices explained in detail the consequences of failing to respond properly to motions for summary judgment and statements of material facts under Fed. R. Civ. P. Rule 56 and Local Rule 56.1 (N.D. Ill.).   Indeed, the Court admonished Boyce about summary judgment filing requirements only a year ago in another case involving medical care.   *See Boyce v. Carter*, Case No. 12 C 5372 (N.D. Ill.), Memorandum Opinion and Order of September 8, 2014 (St. Eve, J.), at pp. 2-5.

Despite these admonitions, Boyce's submissions called "Oppositions" to Defendants' statements of fact contain multiple instances of legal arguments, improperly supported factual propositions, contradictions with prior sworn testimony, and assertions of fact about matters concerning which Boyce cannot properly testify.   A plaintiff's *pro se* status does not excuse him from complying with federal and local procedural rules.   *See McNeil v. United States*, 508 U.S. 106, 113 (1993); *Collins v. Illinois,* 554 F.3d 693, 697 (7th Cir. 2009).   Indeed, Boyce is no stranger to *pro se* litigation having filed at least nine civil rights actions in this district alone.   *See Boyce v. Kelly*, No. 12 C 3840; *Boyce v. Carter*, No. 12 C 5372; *Boyce v. Gray*, No. 13 C 2967; *Boyce v. Martella*, No. 13 C 6526; *Boyce v. Johnson*, No. 13 C 6832; *Boyce v. Lemke*, No. 14 C 0108; *Boyce v. Obaisi*, No. 14 C 0418; and *Boyce v. Madigan*, No. 15 C 7580.

In general, Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Local Rule 56.1(a) requires the moving party to provide "a statement of material facts as to which

the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." *Petty v. City of Chicago,* 754 F.3d 416, 420 (7th Cir. 2014). "The non-moving party must file a response to the moving party's statement, and, in the case of any disagreement, cite 'specific references to the affidavits, parts of the record, and other supporting materials relied upon.' "*Id.* (citation omitted); *see also* L.R. 56.1(b)(3)(A). In addition, legal arguments, suppositions, and conclusions of law are not "facts." *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts") (citations omitted); *Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006) ("statement of material facts … filled with irrelevant information, legal arguments, and conjecture" was improper).

With these standards in mind, Boyce's broad denials of Defendants' statements of fact lack any specificity as to exactly which details Defendants have allegedly misstated in their respective statements of facts, or precisely where support for Boyce's position can be found. In his Local Rule 56.1 statements, Boyce disputes whole sections of Defendants' statements of facts without any specificity. In response to the Wexford Defendants' statement of facts, for example, Boyce writes one sentence challenging fifteen statements of fact followed by another single broadside contesting seventeen statements of fact: "(32) through paragraphs (46). Plaintiff disputes. Obaisi and Defendants are trying to separate themselves from liability. Plaintiff rights was [sic] violated. See plaintiff's declaration, paragraphs 9, 10, 17, 20, 28, 34, 41, 42, 43." "(47) through (63). Plaintiff disputes on the grounds of pltff's declaration, see paragraphs 9, 10, 11, 17, 18, 20, 28, 29, 34, 35, 41, 42, 43. Plaintiff rights was violated." (R. 181, p. 7.) These "responses" do not comply with the Local Rules and are not responsive in any meaningful way.

In addition, the Court will not consider Boyce's statements of additional facts because they are not factual assertions, but rather consist of a series of open-ended legal questions, all beginning in "whether:" (1) "Whether Duvall could've called medical personnel to assist in obtaining plaintiff medical treatment; (2) Whether Duvall had knowledge of plaintiff['s] serious medical needs," etc. *See* Boyce's Opposition to IDOC Defendants' Statement of Facts (R. 180) at pp. 10-13; Boyce's Opposition to Wexford Defendants' Statement of Facts (R. 181), at pp. 9-11. Even if the Court could find a way to frame Boyce's statements of legal issues as "facts," those additional facts are unsupported by citations to the record. Accordingly, the Court will not consider Boyce's alleged additional "facts" because, construed broadly, they are not "statement[s], consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." *See* Local Rule 56.1(b)(3)(C); *see also Boyce v. Carter*, Case No. 12 C 5372 (N.D. Ill.), Memorandum Opinion and Order of September 8, 2014, at pp. 4-5.

Furthermore, the Court will not consider Boyce's disagreements with Defendants' factual assertions where he either simply asserts that a fact is "irrelevant," or where he disputes a statement of material fact from Defendants but does not contradict with evidence. "[T]hat is how summary judgment works: properly supported statements of material fact are deemed to be undisputed unless the opposing party produces admissible, contradictory evidence." *Huon v. Mudge*, 597 Fed. App'x 868, 870 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(e)(2); *see also Tindle v. Pulte Home Corp.*, 607 F.3d 494, 495-96 (7th Cir. 2010). "And factual disputes about immaterial matters are irrelevant." *Huon*, 597 Fed. App'x at 870.

Boyce has failed to set forth most of his additional actual facts in a separate statement, as required by Local Rule 56.1(b)(3)(C). Numerous paragraphs of Boyce's 56.1(b)(3)(B)

responses make factual assertions that go well beyond the facts asserted in the corresponding paragraphs of Defendants' Local Rule 56.1(a)(3) statement. The Court will not consider any extraneous factual assertions because Boyce was required to assert any additional facts in a separate Local Rule 56.1(b)(3)(C) statement. *See Ciomber,* 527 F.3d at 643-44.

The Court further notes that unsupported statements in a legal brief are not evidence that the Court can consider at summary judgment. *See INS v. Phinpathya*, 464 U.S. 183, 188 n.6 (1984); *United States v. Chapman,* 694 F.3d 908, 914 (7th Cir. 2012); *Gross v. Knight*, 560 F.3d 668, 672 (7th Cir. 2009). In other words, "[u]nder settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion." *Beard v. Don McCue Chevrolet, Inc.*, No. 09 C 4218, 2012 WL 2930121, at *5 (N.D. Ill. Jul. 18, 2012). Also, the Court will not consider Boyce's attempts to challenge the validity of medical records and entries in the medical records because he does not present any contrary evidence. *See Richmond v. Dart*, No. 11 C 0065, 2012 WL 6138751, at *1 (N.D. Ill. Dec. 11, 2012); *Johnson v. Hart*, No. 10 C 0240, 2011 WL 5509546, at *2 (N.D. Ill. Nov. 8, 2011).

Further, Boyce cannot testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. *See* Fed. R. Evid. 602. Boyce, for example, cannot refute Dr. Obaisi's representation that he does not personally review medical request slips unless Boyce can produce an evidentiary foundation for challenging that statement. Similarly, Boyce cannot assert that the Wexford Defendants secretly meet to discuss grievances in the absence of some basis for that assertion. In addition, a layperson may not testify about matters involving medical, technical, or other specialized knowledge.[1] *See* Fed. R. Evid. 701, 702.

---

[1] The Court is mindful that a number of recent Seventh Circuit cases counsel, in the usual course, the advisability of recruiting counsel in *pro se* medical cases. *See, e.g., Henderson v. Ghosh*, 755 F.3d 559,

Moreover, litigants cannot create "sham issues of fact" with evidence that contradicts their sworn depositions. *See Janky v. Lake County Convention & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009). "[S]ummary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact." *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010). "A deponent may not use an affidavit sworn to after a deposition to contradict deposition testimony without giving a credible explanation for the discrepancies." *Abraham v. Washington Group Int'l, Inc.,* 766 F.3d 735, 741 (7th Cir. 2014).

## II.    Relevant Facts

### A.    Parties

Plaintiff Anthony Boyce is an inmate in the custody of the Illinois Department of Corrections ("IDOC"). (https://www.illinois.gov/idoc/OFFENDER/Pages/InmateSearch.aspx.) Boyce is serving a life sentence for murder stemming from a plot to impersonate an acquaintance and murder him for insurance proceeds. (R. 164, Godinez, Lemke, Rabideau, Johnson, and Duvall's (hereafter, "IDOC Defts") Stmt. Facts, ¶ 26.) Boyce is also serving a twelve-year sentence for solicitation of murder. *See People v. Boyce*, 2013 IL App (1st) 102318-U, ¶ 1 (Ill. App. 1 Dist. 2013), *aff'd*, 2015 IL 117, 389 Ill. Dec. 585 (Feb. 2015).

During the relevant time period, Boyce was incarcerated at the Stateville Correctional Center ("Stateville"). (R. 74, Second Am. Compl., ¶ 1; R. 164, IDOC Defts' Stmt. Facts, ¶ 27.)

---

564-67 (7th Cir. 2014); *Junior v. Anderson*, 724 F.3d 812, 815-16 (7th Cir. 2013). The Court declined to enlist counsel in this case principally because (1) Boyce's medical claims are not complex because they involve simple injuries from fights; (2) Boyce is a relatively experienced litigator having filed eight civil rights actions and one habeas action in this district; (3) Boyce has proven himself to be an astute litigator; and (4) Boyce experienced conflict with recruited *pro bono* counsel in *Boyce v. Kelly*, Case No. 12 C 3840 (N.D. Ill.).

Defendant Salvador Godinez was the Director of IDOC from April 2011 until December 31, 2014. (IDOC Defts' Stmt. Facts, ¶ 2.) Defendant Michael Lemke was Stateville's Warden from January 1, 2013, to December 31, 2013. (*Id.*, ¶ 6.) Also, Defendant Ada Johnson served as a placement officer at Stateville from July 1, 2011, through January 14, 2013. (*Id.*, ¶ 11.) Defendant Karen Rabideau has worked as a placement officer at Stateville since January 15, 2013. (*Id.*, ¶ 14.) Defendant Kim Duvall has held the position of correctional counselor at Stateville since March 2013. (*Id.*, ¶ 17.)

Wexford Health Sources is a private corporation that has contracted with the IDOC to provide medical services to inmates at various correctional facilities, including Stateville. (R. 153, Halloran, Hale, Obaisi's (hereafter, "Wexford Defts") Stmt. Facts, ¶ 3.) Defendants Mark Hale, Kevin Halloran, and Saleh Obaisi are all Wexford employees. (*Id.*, ¶¶ 3, 5, 6.) Defendant Obaisi is a physician and Stateville's medical director. (*Id.*, ¶¶ 2, 3.) Defendant Hale was Wexford's president and chief executive officer until he retired in 2014. (*Id.*, ¶ 5.) Defendant Kevin Halloran is Wexford's chairperson. (*Id.*, ¶ 6.) Defendant Hale, as president and CEO of Wexford Health Sources, and Defendant Halloran, as its Chairperson, are or were responsible for managing the company's business operations. (*Id.*, ¶ 43.) Neither Hale nor Halloran has any medical training or are personally involved in providing medical care to inmates. (*Id.*, ¶¶ 48-49.) Also, neither Hale nor Halloran personally oversees the provision of medical care at Stateville. (*Id.*, ¶ 51.) Inmate medical grievances are not forwarded to Hale or Halloran. (*Id.*, ¶ 56.)

### B. Incidences Underlying Boyce's Claims

In January 2007, Boyce received a ticket for fighting and an Adjustment Committee found him guilty of the charge. (IDOC Defts' Stmt. Facts, ¶ 29.) On May 4, 2008, Boyce received a ticket for assaulting fellow inmate J. Williams and hearing officers found Boyce guilty of assault.

(*Id.*, ¶ 30.)   This was Boyce's first physical altercation with Williams.   (*Id.*)   In June 2012, correctional officials found Boyce guilty of committing an assault on a third prisoner.[2]   (*Id.*, ¶ 32.) Boyce alleges that he filed a grievance dated February 12, 2013, concerning Williams, the victim of his May 2008 attack.   Boyce stated that Williams was threatening to beat him up as "retribution for a prior confrontation."   (IDOC Defts' Stmt. Facts, ¶ 93.)   The IDOC has no record of such a grievance at any level of review.   (*Id.*, ¶ 92.)

From December 11, 2012, until March 15, 2013, Boyce and Miguel Adorno shared a cell at Stateville.   (*Id.*, ¶ 33.)   Adorno and Boyce had never experienced any conflict prior to becoming cellmates, although Boyce never entirely trusted Adorno believing that correctional officials had assigned Adorno to his cell in to "spy" on him.   (*Id.*, ¶¶ 34, 41, 42.)   Further, Boyce claims that he wrote letters to Godinez, Lemke, Johnson, and Rabideau requesting to be moved from his cell because he feared for his life.   (*Id.*, ¶ 35.)   Boyce does not remember when he wrote letters requesting a move or even how long he had been cellmates with Adorno before he started writing letters asking to be moved.   (*Id.*)   Boyce does not remember why he said his life was in danger. (*Id.*)   Also, Boyce does not recall having any face-to-face conversations with Defendants Godinez, Lemke, Johnson, or Rabideau regarding his desire to switch cells.   (*Id.*, ¶ 36.)

On February 28, 2013, Boyce filed another grievance concerning Adorno.   (*Id.*, ¶ 90.) Boyce submitted the document as an emergency grievance.   (*See* Unmarked Ex. to Second Am. Compl.)   Boyce wrote, "My celly is working with the administration trying to take me down on trumped up charges…."   (IDOC Defts' Stmt. Facts, ¶ 90.)   The grievance also stated that Adorno was dangerous, that he had been "exposed to psycho meds," and that Boyce's "life could be in

---

[2] In response to Defendants' Statement of Facts, Boyce asserts that he was the victim rather than the aggressor.   Boyce, however, cannot argue facts inconsistent with his disciplinary conviction.   *See Helman v. Duhaime*, 742 F.3d 760, 762 (7th Cir. 2014).

jeopardy." (*Id.*)  Warden Lemke did not receive the emergency grievance until April 5, 2013. (Unmarked Ex. to Second Am. Compl.)

Up to this point, Boyce and Adorno had never had any physical altercations.  (IDOC Defts' Stmt. Facts ¶ 43.)  Boyce maintains that he sometimes felt in danger because Adorno acted aggressively, but he cannot point to any specific words or actions that made him fear Adorno. (*Id.*, ¶ 44.)  Also, Boyce does not remember when Adorno allegedly started threatening him or how many times Adorno may have uttered threats.  (*Id.*)

In the pre-dawn hours of March 15, 2013, Boyce and Adorno had a disagreement.  (*Id.*, ¶ 39.)  Boyce does not remember what the disagreement concerned, although Boyce contends that Adorno assaulted him as he slept.  (*Id.*; Wexford Defts' Stmt. Facts, ¶ 13.)  In addition, Boyce says that he does not know why Adorno attacked him.  (IDOC Defts' Stmt. Facts, ¶ 13.)  Within "[a] few minutes, give or take" of the attack, Boyce was transported by wheelchair to the health care unit for treatment of his injuries.  (*Id.*, ¶ 40; Wexford Defts' Stmt. Facts, ¶ 14; Boyce Dep., pp. 132-33.)  The nurse who examined Boyce detected small bumps and bruises to his head. (Wexford Defts' Stmt. Facts, ¶ 15.)  Boyce, however, says that he was severely beaten, that he had two black "raccoon" eyes, "lost [his] teeth, and had "knots every freaking where."  (Boyce Dep., p. 133.)  Thereafter, the health care staff admitted Boyce to the infirmary for 23-hour observation.  (*Id.*, ¶ 16.)  While under observation, nurses regularly checked on Boyce while he was in the infirmary.  (*Id.*)  Health care providers also placed Boyce on a saline IV and administered Tylenol.  (*Id.*, ¶ 17.)

That same morning, Dr. Obaisi examined Boyce.  (IDOC Defts' Stmt. Facts, ¶ 40; Wexford Defts' Stmt. Facts, ¶ 18.)  At that time, Boyce voiced no complaints, and Dr. Obaisi found him to be "asymptomatic."  (Wexford Defts' Stmt. Facts, ¶ 18.)  Dr. Obaisi's physical

examination revealed minor bruising on Boyce's forehead and cheeks.  (*Id.*)  In addition, Dr. Obaisi performed a neurological examination detecting no abnormalities.  (*Id.*)  Dr. Obaisi diagnosed Boyce with facial bruises without loss of consciousness.  (*Id.*, ¶ 19.)  At some point, Dr. Obaisi authorized Boyce's discharge from the infirmary with instructions to follow up in three days.  (*Id.*)  Dr. Obaisi also referred Boyce to IDOC Dentist Jacqueline Mitchell (not a Defendant) for a dental evaluation.  (*Id.*)

On March 19, 2013, a physician's assistant Tonya Williams (not a Defendant) performed a follow-up evaluation.  (*Id.*, ¶ 20.)  Because Boyce complained of an upset stomach and blurry vision, Williams prescribed him Bentyl for stomach cramps and referred him to an optometrist.  (*Id.*)  Also on March 19, 2013, Dr. Mitchell performed a dental exam and extracted a tooth.  (*Id.*, ¶ 21.)  After the extraction, Dr. Mitchell prescribed Motrin and antibiotics.  (*Id.*)

On November 5, 2013, Boyce filed an emergency grievance concerning inmate Williams.  (*Id.*, ¶ 94.)  Boyce reiterated that Williams had threatened to beat him up.  (*Id.*)  Boyce stated, "I don't want to get hurt or have to defend myself and hurt him."  (*Id.*)  Defendant Lemke denied Boyce's request for emergency review and directed him to file a normal grievance.  (IDOC Defendants' Ex. I to their Summ. J. Mot.)

Thereafter, on November 28, 2013, Boyce was returning from the visiting room when he encountered inmate Williams and a second inmate, Charles Boyd.  (IDOC Defts' Stmt. Facts, ¶ 48.)  Boyce was involved in a physical altercation with these other two inmates.  (*Id.*)  According to Boyce, Williams is a Black Gangster Disciple.  (*Id.*, ¶ 53.)  Williams and Boyd reportedly warned Boyce that they planned to enlist members of the Gangster Disciples, Black Disciples, and Black Gangsters to assault him.  (*Id.*, ¶ 52.)  As a result of the altercation, Boyce

received a disciplinary ticket for fighting and was sent to segregation. (*Id.*, ¶ 51.) A hearing committee found Boyce guilty of the charge. (*Id.*)

Boyce asserts that while he remained in segregation, he relayed Williams' and Boyd's threat to Lemke. (*Id.*, ¶ 53.) In addition, Boyce states that he wrote letters and grievances apprising Lemke and IDOC Director Godinez that he was in danger. (*Id.*, ¶ 54.) Boyce maintains that he specifically noted in one of his grievances that Williams had said that he was going to "get" Boyce in the visiting room. (*Id.*, ¶ 55.) Boyce, however, cannot explain why Williams was threatening him and, at his deposition, he could only say that Williams had vowed to "whup" him. (*Id.*, ¶ 56.) After the November 28, 2013, fight, Boyce claims that he wrote a letter to Defendants Godinez and Lemke asking them to keep him separate from Gangster Disciples, Black Gangsters, and the Black Disciples.

Prior to the November 2013 episode, Boyce had never experienced any conflict with Boyd. (*Id.*, ¶ 61.) Williams, however, was the same inmate who correctional officials previously had found Boyce guilty of assaulting in 2008. (*Id.*, ¶ 63.) In the intervening years, Boyce and Williams had resolved their dispute, and Boyce claims not to know why Williams suddenly started threatening him. (*Id.*, ¶ 64.) Boyce and Williams were never cellmates and a fence always remained between the two inmates other than in the area of the visiting room. (*Id.*, ¶¶ 65, 66.) Prior to the altercation in November 2013, Boyce had encountered Williams in the visiting room a few times without incident. (*Id.*, ¶ 67.)

Following the November 2013 incident, Boyce reported to the health care unit where he complained of back and shoulder pain. (*Id.*, ¶ 50; Wexford Defts' Stmt. Facts, ¶ 24.) The nurse who performed a physical examination found only minor bumps and bruises on Boyce's shoulder and lower back. (IDOC Defts' Stmt. Facts, ¶ 67; Wexford Defts' Stmt. Facts, ¶ 24.) Boyce,

however, testified that he had a knot on his head that was "like the size almost like an orange, almost." (Boyce Dep., p. 135.)  In any event, the nurse provided Boyce with Tylenol and Ibuprofen.  (Wexford Defts' Stmt. Facts, ¶ 25.)  Medical personnel promised Boyce that they would call him back to the health care unit for follow-up care, but they failed to do so.  (IDOC Defts' Stmt. Facts, ¶ 58.)  Boyce maintains that he asked Defendant Duvall for assistance in getting additional medical treatment.  (*Id.*)  According to Boyce, Duvall said that she would "look into it," but she apparently never acted on Boyce's request.  (*Id.*, ¶¶ 58, 59.)

Dr. Obaisi saw Boyce in June 2013, July 2013, and earlier in November 2013 in connection with additional medical complaints unrelated to this lawsuit.  (Wexford Defts' Stmt. Facts, ¶ 22.) Dr. Obaisi, however, had no involvement in the provision of medical treatment relating to injuries stemming from the November 2013 altercation.  (*Id.*, ¶¶ 26, 27.)  Boyce believes that he may have seen Dr. Obaisi in or around the following month, December 2013, but only "in passing." (*Id.*, ¶ 27.)

On January 3, 2014, Boyce was involved in a shower room fight with inmates Stephen Moore and Michael Russell.  (IDOC Defts' Stmt. Facts, ¶ 68.)  According to Boyce, Moore and Russell are members of the Gangster Disciples.  (*Id.*, ¶ 69.)  Immediately prior to the attack, Moore and Russell said, "You told on our guys, Boone and Wanke.  Either you can accept this ass whupping, or you're going to go out there and assault the Lieutenant for telling on our guys."  (*Id.*, ¶ 76.)  The two inmates had reportedly targeted the lieutenant for engineering the transfer of two gang members to another facility.  (*Id.*)  Boyce suffered injuries in the brawl and was admitted to the prison infirmary.  (*Id.*, ¶ 70.)  Boyce did not know Russell prior to the incident, although Moore and Boyce had been cellmates for a few days and Boyce vaguely recalls that Moore spoke to him in an aggressive manner.  (*Id.*, ¶¶ 72, 73.)

Thereafter, Boyce told the security staff, who escorted him to the health care unit, that he had slipped and fallen in the shower. (Wexford Defts' Stmt. Facts, ¶ 29.) Staff physician Ann Davis (not a Defendant) then performed a physical examination. (*Id.*, ¶ 30.) Dr. Davis provided Boyce with ice and prescribed pain medication. (*Id.*) In addition, Dr. Davis referred Boyce for a dental evaluation. (*Id.*) The next day, Boyce underwent a dental evaluation and then returned to the health care unit. (*Id.*, ¶ 32.) Dr. Davis re-evaluated Boyce and admitted him to the Stateville infirmary where the nursing staff outfitted him with an IV, kept him under close observation, and provided him with Tylenol. (*Id.*, ¶¶ 32-34.) Boyce remained in the infirmary from January 3, 2014, to January 9, 2014. (*Id.*, ¶ 34.)

On January 9, 2014, Dr. Davis examined Boyce again and determined that he was not in any acute distress. (*Id.*, ¶ 35.) Consequently, Dr. Davis discharged Boyce from the health care unit with instructions to return for a follow-up appointment. (*Id.*) Dr. Davis also confirmed that Boyce was scheduled to see a dentist. (*Id.*) On January 14, 2014, the medical staff x-rayed Boyce's face and mandible. (*Id.*, ¶ 36.) The x-rays revealed no fractures or abnormalities. (*Id.*) After the medical staff discharged Boyce from the health care unit, correctional officials placed him in protective custody at his request. (IDOC Defts' Stmt. Facts, ¶ 77.)

Next, on January 25, 2014, Boyce went to the health care unit complaining of pain in his right hip. (Wexford Defts' Stmt. Facts, ¶ 37.) A nurse authorized a three-day "lay-in" allowing Boyce to receive meals in his cell. (*Id.*) The nurse further encouraged Boyce to continue taking his prescribed medications. (*Id.*) Also on January 25, 2014, Boyce returned to the health care unit for a follow-up appointment with Dr. Davis. (*Id.*, ¶ 38.) Dr. Davis prescribed Tylenol, Naproxen (a non-steroidal, anti-inflammatory pain medication), and Orabase (a local anesthetic used to treat mouth pain). (*Id.*) Dr. Davis also extended Boyce's lay-in permit and ordered an

x-ray of his hip. (*Id.*) X-rays of Boyce's pelvis and hip taken on February 3, 2014, revealed no fractures or abnormalities. (*Id.*, at ¶ 39.) Boyce remained under the care of Dr. Davis throughout this period and he had no contact with Dr. Obaisi either while he was housed in the infirmary or otherwise relating to the care he received after the January 3, 2014, altercation. (*Id.*, ¶¶ 36, 40.)

On February 13, 2014, Boyce moved into a cell with an inmate named Sutherland. (IDOC Defts' Stmt. Facts, ¶ 78.) None of the named Defendants had any involvement in the move. (*Id.*) Boyce balked at the cell assignment notifying the officer that Sutherland was a Gangster Disciple and thus a perceived threat to him. (*Id.*, ¶ 79.) Boyce shared a cell with Sutherland for approximately eight to ten hours. (*Id.*) In those hours, Sutherland made sexual advances at Boyce, threatened to beat him up, and charged at him. (*Id.*, ¶ 80.) It is undisputed that Sutherland rushed at Boyce, but did not make physical contact with him. (*Id.*, ¶ 81; Boyce Dep., pp. 137, 168.) While dodging Sutherland, Boyce hit his already injured hip against a bed or the wall. (*Id.*)

Following the incident with Sutherland, a nurse examined Boyce. (IDOC Defts' Stmt. Facts, ¶ 80; Wexford Defts' Stmt. Facts, ¶ 43.) The nurse prescribed Ibuprofen and advised Boyce to continue taking his previously prescribed pain medication. (IDOC Defts' Stmt. Facts, ¶ 80; Wexford Defts' Stmt. Facts, ¶ 43.) The next day, Boyce had a follow-up visit in the health care unit at "nurse sick call." (IDOC Defts' Stmt. Facts, ¶ 80; Wexford Defts' Stmt. Facts, ¶ 44.) The nurse who examined Boyce provided him with a lower dosage of Ibuprofen than the day before. (Wexford Defts' Stmt. Facts, ¶ 44.) Also, the nurse scheduled Boyce for a follow-up appointment with a physician on February 26, 2014, however, IDOC transferred Boyce from Stateville to Pontiac Correctional Center that day. (*Id.*, ¶¶ 44, 46.) Again, Dr. Obaisi had no involvement in the care Boyce received following the Sutherland episode. (*Id.*, ¶ 45.)

Boyce maintains that at some point during his incarceration at Stateville, he asked for a transfer to another facility so that he would be separated from members of certain gangs, including the Gangster Disciples, the Black Gangsters, and the Black Disciples. (IDOC Defts' Stmt. Facts, ¶ 45.) Boyce believes that enemy gang members were a threat to his life and well-being. (*Id.*) Furthermore, Boyce claims that he notified Defendant Godinez through letters and grievances that he was living in fear because certain gangs posed a threat, and thus sought transfer to a different correctional facility. (*Id.*, ¶ 46.) Director Godinez was not aware of and never read any such letters. (*Id.*, ¶ 5.) Due to the sheer number of letters he receives as IDOC Director, Godinez is unable to personally open or review every piece of mail addressed to him in that capacity. (*Id.*) Instead, Godinez relies on the inmate grievance system to handle prisoner complaints. (*Id.*) Also, Boyce alleges that he told Defendant Lemke face-to-face that certain gangs posed a threat to him. (*Id.*, ¶ 47.) Lemke, however, does not recall any such conversations. (*Id.*, ¶ 10.) In the usual course, Lemke follows up with the Internal Affairs and Intelligence Units whenever an inmate brings safety concerns to his attention. (*Id.*)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323 (1986).  After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson,* 477 U.S. at 255 (quotation omitted).  A court's "job when assessing a summary judgment motion is not to weigh evidence, make credibility determinations, resolve factual disputes and swearing contests, or decide which inferences to draw from the facts."  *Miller v. Gonzalez,* 761 F.3d 822, 827 (7th Cir. 2014).

## ANALYSIS

### I.    IDOC Defendants—Failure to Protect Claim

#### A.    Legal Standard

Correctional officials have a duty to protect inmates from violent assaults by other inmates.  *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 669 (7th Cir. 2012) (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)).[3]  To clarify, "a prison has a duty to its inmates to protect them against violence by other inmates because imprisoning a person blocks his access to forms of self-protection and police protection that he would have on the outside."  *Glade ex rel. Lundskow v. United States,* 692 F.3d 718, 722 (7th Cir. 2012).  Specifically, the Constitution imposes on correctional officials a duty to "take reasonable measures to guarantee the safety of the inmates and to protect them from harm at the hands of others."  *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (quoting *Farmer*, 511 U.S. at 832-33).  This "duty is violated only by deliberate indifference to a known substantial risk."  *Smith v. Sangamon County Sheriff's Dep't,* 715 F.3d 188, 191 (7th Cir. 2013); *see also Farmer,* 511 U.S. at 835 ("deliberate indifference describes a state of mind more blameworthy than negligence").  To establish

---

[3] This opinion relies on both Eighth and Fourteenth Amendment cases because the Fourteenth Amendment entitles pretrial detainees to "at least as much protection" from harm as the Eighth Amendment affords to convicted criminals.  *See Belbachir v. Cnty. of McHenry,* 726 F.3d 975, 979 (7th Cir. 2013).

deliberate indifference under the circumstances, Boyce must show that the IDOC Defendants were actually aware of a substantial risk of harm to his safety, and yet, failed to take the appropriate steps to protect him from the harm. *See Smith,* 715 F.3d at 191; *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007). More specifically, to demonstrate that he has an Eighth Amendment claim, Boyce must present evidence that: (1) he was incarcerated under conditions posing a substantial risk of serious harm, and (2) defendants acted with deliberate indifference to that risk. *See Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010); *Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008).

The first prong of a failure to protect claim—considered the objective prong—requires a plaintiff to show that he was "incarcerated under conditions posing a substantial risk of serious harm." *Estate of Miller ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012). To satisfy this prong, a plaintiff must demonstrate not only that he experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that serious harm might actually occur. *See Santiago*, 599 F.3d at 758. "When [Seventh Circuit] cases speak of a 'substantial risk' that makes a failure to take steps against it actionable under the Eighth or Fourteenth Amendment, they also have in mind risks attributable to detainees with known 'propensities' of violence toward a particular individual or class of individuals; to 'highly probable' attacks; and to particular detainees who pose a 'heightened risk of assault to the plaintiff.'" *Brown v. Budz,* 398 F.3d 904, 911 (7th Cir. 2005). This general definition of "substantial risk" includes "risks so great that they are almost certain to materialize if nothing is done." *Id.* at 911. Not every harm caused by another inmate translates into constitutional liability for the corrections officers responsible for the prisoner's safety. *See Farmer*, 511 U.S. at 834; *Miller v. Turner*, 26 Fed. App'x 560, 563 (7th Cir. 2001). A "mere possibility of

violence" or the occurrence of a random act of violence is insufficient to impose liability on prison officials. *See Miller*, 26 Fed. App'x at 563; *see, e.g., Rice,* 675 F.3d at 669. Simply put, "an unfortunate random act of violence in a prison ... does not impose liability on prison officials." *Washington v. LaPorte County Sheriff's Dep't*, 306 F.3d 515, 519 (7th Cir. 2002).

To satisfy the subjective prong of the deliberate indifference test, a plaintiff must show that the defendant acted with deliberate indifference to the substantial risk of serious harm. *See Farmer*, 511 U.S. at 838; *Brown*, 398 F.3d at 913. The subjective prong has two subparts (a) knowledge of the risk, and (b) a disregard of that risk. *See Brown,* 398 F.3d at 913, 916. Under this standard, Boyce must set forth evidence creating a genuine material dispute for trial that prison officials were aware of a specific, impending, and substantial threat to his safety, which an inmate can demonstrate through complaints to prison officials about the danger. *See Morris v. Ley*, 331 Fed. App'x 417, 419 (7th Cir. 2009); *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996). Although this is a subjective test, an inmate may prove it through circumstantial evidence. *See Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.") (internal citation omitted).

To be held liable under § 1983, the defendant "must both be aware of the facts from which an inference could be drawn that a substantial risk of harm exists, and he must also draw that inference." *Id*. at 838; *see also Brown*, 398 F.3d at 913. Negligence or even gross negligence is insufficient to implicate the Constitution, rather, for liability to attach under § 1983, the officer must have acted with "the equivalent of criminal recklessness." *Guzman*, 495 F.3d at 857 (citation omitted). The relevant inquiry is whether the correctional officials actually

knew about the danger that the plaintiff faced, not whether a reasonable official should have known. *See Case v. Ahitow*, 301 F.3d 605, 605 (7th Cir. 2002) (distinguishing deliberate indifference from negligence). Actual knowledge cannot be imputed to a prison official if the plaintiff himself was unaware of a specific threat. *See Guzman*, 495 F.3d at 857-58.

### B.  Personal Involvement of IDOC Director Salvador Godinez

Defendant Godinez is entitled to judgment as a matter of law with respect to each incident where Boyce alleges a failure to protect. Section 1983 is premised on the wrongdoer's personal responsibility, therefore, an individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation. *See Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012) (citations omitted). The doctrine of *respondeat superior* (blanket supervisory liability) does not apply to actions filed under 42 U.S.C. § 1983. *See Kinslow v. Pullara,* 538 F.3d 687, 692 (7th Cir. 2008). To be held liable under § 1983, supervisors "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010).

IDOC's Director is too far removed from individual housing decisions and keep-separate decisions to be held liable under the facts of this case, even viewing the facts in a light most favorable to Boyce. *See Franklin v. Hardy*, No. 12 C 2970, 2013 WL 3147365, at *3 (N.D. Ill. Jun. 19, 2013) (IDOC Director not liable for claim involving individual medical care); *Mims v. Hardy*, No. 11 C 6794, 2012 WL 2116100, at *4 (N.D. Ill. Jun. 11, 2012) ("As Director, Defendant Godinez oversees the entire prison system; his role at Stateville is too attenuated for liability under Section 1983 to attach."); *Gray v. Taylor*, 714 F.Supp.2d 903, 911 (N.D. Ill. 2010) (no claim against IDOC's Director in free speech case because "administrators cannot be expected to involve themselves with the minutiae of daily events in the lives of thousands of

prisoners") (citations omitted); *Brown v. Ghosh*, No. 09 C 2542, 2010 WL 3893939, at *7 (N.D. Ill. Sep. 28, 2010) (IDOC's Director would not be "directly involved or have knowledge of the day to day operations" concerning medical care at a particular facility).

Even assuming that Boyce wrote letters to Director Godinez saying that he was in danger, as Boyce claims, Director Godinez properly relies on the inmate grievance process to rectify any issues that may arise. The very purpose of the inmate grievance process is to provide a formal mechanism for addressing and resolving inmate problems before the courts become involved. *See Perez v. Wisconsin Dep't of Corr.*, 182 F.3d 532, 537-38 (7th Cir. 1999) (exhaustion serves purposes of "narrow[ing] a dispute [and] avoid[ing] the need for litigation"); *see also Jernagin v. Spann*, No. 13 C 8857, 2015 WL 4096169, at *2 (N.D. Ill. Jul. 6, 2015). Because Boyce has failed to offer any evidence indicating that Godinez was personally involved in—or even aware of—the circumstances giving rise to this lawsuit, the Court grants summary judgment in favor of Director Godinez. *See Celotex,* 477 U.S. at 322 ("plain language of Rule 56[ ] mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

### C. Placement Coordinator Ada Johnson

Likewise, construing the evidence and reasonable inferences in Boyce's favor, he has failed to present sufficient evidence creating a genuine issue of material fact for trial that Johnson was personally involved in the events giving rise to this lawsuit. *See Minix v. Canarecci,* 597 F.3d 824, 833 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation'") (citation omitted). Moreover, it is uncontested that Johnson was Stateville's placement officer from July 1, 2011, to January

14, 2013, and thus she cannot be held liable for events that took place months after her tenure with IDOC, including the four incidents highlighted in this lawsuit.

### D. Four Incidents

#### 1. Incident of March 15, 2013 (against Lemke, Rabideau, and Johnson)

Boyce has no triable claim against Defendants arising from the attack by his then-cellmate, Adorno, as he can satisfy neither the objective nor subjective prong for Eighth Amendment liability. More specifically, viewing the facts and all reasonable inferences in Boyce's favor, he has failed to set forth evidence that Defendants were aware of the specific risk that Adorno would attack him, and yet failed to respond appropriately to this substantial risk of harm.

First, Boyce has failed to demonstrate that Adorno posed an undue threat to him preceding the March 2013 assault. It is undisputed that Boyce and Adorno got along reasonably well during their three months as cellmates until the March 2013 fight. Although Boyce suspected that the administration had sent Adorno to "spy" on him, the two never engaged in any physical combat or experienced any serious discord prior to March 15, 2013. Adorno even provided Boyce with an affidavit in support of one of Boyce's lawsuits on February 18, 2013, about a month before the fight. (*See* IDOC Defts' Stmt. Facts, ¶ 44; *see also* Ex. 29 to Second Am. Compl.) Boyce maintains that he sometimes felt in danger because Adorno acted aggressively, but he cannot point to any specific words or actions that made him fear Adorno. Also, Boyce does not remember when Adorno allegedly started threatening him or the precise nature of any such threats.

Boyce's vague distrust of Adorno, without more, is insufficient to create a genuine issue of fact for trial that there was a substantial risk that Adorno would attack him. At summary judgment, the inquiry is essentially "whether the evidence presents a sufficient disagreement to

require submission to the jury, or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "When the moving party has carried its burden under Rule 56[a], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott*, 550 U.S. at 380 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal punctuation omitted). Here, Boyce supports his claim that Adorno posed a significant threat with conjecture and speculation, which does not create a material dispute for trial. *See Matthews v. Waukesha Ctny.*, 759 F.3d 821, 824 (7th Cir. 2014) (Although plaintiff "is entitled to the benefit of reasonable inferences, that does not extend to inferences that are supported only by speculation or conjecture.").

Second, irrespective of whether Adorno posed a significant threat to Boyce, Defendants were not on notice that Boyce faced a substantial risk of serious harm. Boyce admittedly did not have any face-to-face conversations with Defendants concerning issues he was experiencing with Adorno. Although Boyce claims to have written letters to Lemke, Johnson, and Rabideau requesting to be moved because he feared for his life, each of the Defendants denies having received any such letters.[4] In any event, Boyce does not remember when he wrote letters asking to be moved, how long he had been cellmates with Adorno before he started writing letters asking

---

[4] The record is replete with a number of instances where Boyce either denies having authored documents in his own handwriting, or he has submitted as exhibits documents that the IDOC has no record of receiving. *See* Exhibits to Second Amended Complaint; Boyce's Dep. at pp. 38-39. The Court notes that Boyce recently chose to voluntarily dismiss with prejudice two cases where Defendants accused him of committing fraud on the Court. *See Boyce v. Kelly*, Case No. 12 C 3840 (N.D. Ill.), and *Boyce v. Martella*, Case No. 13 C 6526 (N.D. Ill.), Minute Entry of June 25, 2015 (St. Eve, J.). Boyce expressly disavowed any fraud in either case, and the Court did not make any findings of fraud. Also, the Court is not making any credibility determinations in this action. Nevertheless, the Court notes that the fraud motions contained a laundry list of Boyce's documented criminal frauds.

to be moved, or why he believed that his life was in danger. Boyce's indistinct disquietude about Adorno did not put Defendants on notice that he faced a substantial risk of serious harm.

Even if the correctional officials did receive Boyce's letters, the letters in question did not give notice of any particularized threat. Prison officials must possess actual knowledge of a specific threat to incur Eighth Amendment liability. *See Grieveson*, 538 F.3d at 776-77 (inmate's statement that he was "afraid" and "wanted to be moved" was insufficient to place correctional officials on notice); *Butera v. Cottey*, 285 F.3d 601, 606 (7th Cir. 2002) (inmate's report that he was "having problems in the block" and "needed to be removed" were insufficient to give notice to correctional officials of a specific threat). One of the letters Boyce submitted as an exhibit to his Second Amended Complaint, for example, is addressed to Defendant Rabideau and states: "Could you move me out the cell with my celly. We're not getting along. We could end up fighting. I don't want that. Please help out Adorno." A second letter, purportedly written to Defendant Johnson, reads, "Could you please move me, my cellmate and I are having problems. I am in fear of my life. I am asking to be moved to a new cell from my celly."

While Defendants certainly might have been more proactive if they had received such letters, ignoring reports that inmates are generally not getting along does not implicate the Eighth Amendment. *See Bentz v. Palmer*, No. 12 C 1573, 2015 WL 1042932, at *4 (N.D. Ill. Mar. 5, 2015) (no liability based on inmate's representation that "we don't get along, and we're just trying to avoid an incident, because we're both at that point, you know, where we don't get along and we're just not compatible in any way, shape, or form"). While it is regrettable that Boyce and Adorno fought (or that Adorno attacked Boyce) after a disagreement, however, the record fails to support a reasonable inference that Defendants knew of the risk of harm, but failed to take measures to abate the substantial risk of serious harm.

The Court further notes that Boyce submitted an emergency grievance concerning Adorno dated February 28, 2013, but Warden Lemke did not receive that grievance until early April 2013, which was after the fight. Nonetheless, the grievance did not apprise Lemke of a substantial risk of serious harm. Specifically, in his grievance, Boyce wrote that (1) his cellmate was working with the administration, (2) Adorno was "dangerous," (3) Adorno was taking psychotropic medication, and (4) Boyce's life "could be in danger." Boyce's grievance is not only based on conjecture, namely, that Adorno was working with the administration, but also describes many inmates at a maximum security facility like Stateville. *See United States v. Tokash,* 282 F.3d 962, 970 (7th Cir. 2002) ("Prisons are inherently dangerous places and are inhabited by violent people."). Moreover, it is well-established that a generalized possibility of prison violence, rather than a specific risk of serious harm, does not implicate the Constitution. *See Shields v. Dart*, 664 F.3d 178, 181 (7th Cir. 2011) (per curiam). Therefore, Boyce's indefinite recollections do not create a genuine issue of material fact for trial that he faced an imminent, particularized threat. Boyce's claim based on Adorno's March 15, 2013, attack thus fails.

### 2. Incident of November 28, 2013 (against Lemke)

Similarly, Boyce has failed to present evidence making a triable showing that Defendant Lemke ignored a significant risk of harm created by inmates Williams and Boyd, who allegedly attacked Boyce after a trip to the visiting room on November 28, 2013. First, Boyce cannot argue, consistent with his disciplinary conviction for fighting, that he was the entirely innocent victim of an assault. *See Hill v. Murphy*, 785 F.3d 242, 249 (7th Cir. 2015) (citing *Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010)) (inmates could not make excessive force claims against arresting officers that were incompatible with convictions for resisting arrest). Second, Defendants cannot be held responsible for an unexpected, out-of-the-blue attack. Boyce assaulted Williams in May

2008, more than five years prior to the November 2013 clash. At his deposition, Boyce conceded that he and Williams had talked things out and resolved their differences shortly thereafter, and Boyce saw Williams only a few times en route to and from the visiting room in the ensuing years. Boyce cannot explain why Williams was suddenly threatening him or wanted to attack him. Further, Boyce did not even know his second alleged assailant, inmate Boyd. A reasonable trier of fact could not find Lemke liable for an assault Boyce himself could not have anticipated. *See, e.g., Guzman*, 495 F.3d at 857-58. Accordingly, the Court grants the IDOC Defendants' summary judgment motion as to the November 28, 2013, incident.

### 3.    Incident of January 3, 2014 (against Lemke)

Similarly, Boyce has failed to produce evidence sufficient to go to the jury with respect to the January 3, 2014, shower room attack. According to Boyce, his cellmate Moore and another individual named Michael Russell confronted him for having "told on [their] guys." Moore had been Boyce's cellmate for a few days prior to the incident. Boyce recalls that Moore spoke "aggressively" to him on occasion, but, once again, he cannot not point to any threats or disputes. Boyce did not know the second assailant, Russell.

Moreover, the evidence in the record does not support a finding that Boyce made Defendants aware of any substantial, concrete risk. "[B]road charges [that] fail to identify any tangible or imminent risk of harm" are "to general and uncertain" to show that an inmate apprised prison officials of a serious risk of serious harm. *Wilson v. Ryker*, 451 Fed. App'x 588, 589-90 (7th Cir. 2011). Specifically, "[a] claim of being celled with inmates of different races or gang affiliations without more—such as the existence of a threat or history of violence—is too general and uncertain" to support a failure-to-protect claim." *Id.* at 590. Indeed, a general risk of violence, alone, does not establish knowledge of a substantial risk of harm. *See Shields*, 664 F.3d

at 181; *Brown,* 398 F.3d at 911.   The facts viewed in Boyce's favor do not suggest that he was "almost certain" or "very likely" to suffer serious harm at the hands of Moore and Russell.   In addition, correctional officials' actions after the incident would tend to belie any inference of deliberate indifference.   More specifically, the Court notes that when Boyce asked for placement in protective custody following the attack, the correctional officials granted his request.

As such, construing the evidence and all reasonable inferences in Boyce's favor, he has not set forth evidence creating a material dispute for trial regarding his claim based on the January 3, 2014, shower room attack.   The Court therefore grants the IDOC Defendants' summary judgment motion as to this incident.

### 4.      Incident of February 13, 2014 (against Godinez and Lemke)

Next, Boyce maintains that on February 13, 2014, correctional officials moved him into a cell with an inmate named Sutherland.   Boyce admits that none of the named Defendants was involved in the move.   Nonetheless, Boyce asserts that he notified the officer responsible for the move that Sutherland was a member of the Gangster Disciple gang and that the gang had placed a "hit" on him.   According to Boyce, the officer ignored his concerns.   Boyce contends that shortly after his arrival to his new cell, Sutherland made sexual advances and threatened to beat him.   It is undisputed, however, that Sutherland made no physical contact with Boyce.   Instead, Boyce asserts that he banged his hip when he dodged Sutherland's advances.   Under the circumstances, whether or not Sutherland presented a substantial risk of serious harm, technically, Sutherland caused no injury, and thus Boyce has provided a basis for liability.

Nonetheless, Boyce's injury does not rise to the level of a constitutional violation. Although the Constitution places a duty upon correctional officials to protect inmates from

26

violence, not every injury suffered by a prisoner violates his civil rights. *See Fisher v. Lovejoy*, 414 F.3d 659, 661-62 (7th Cir. 2005). "Prison officials owe inmates, both those who have been convicted and those being detained while awaiting trial, a duty to protect them from violence inflicted by other inmates." *Guzman*, 495 F.3d at 856-57. Nevertheless, "[o]ur case law … makes clear that this federal constitutional protection extends only to objectively serious injuries." *Id.* at 857; *see also Fisher*, 414 F.3d at 662 ("The Supreme Court has recognized that inmates are entitled to relief only when their injury is objectively serious."). Regardless of whether the named Defendants should have prevented the cell assignment, bumping one's injured hip does not approach the level of an objectively serious injury.

In sum, Boyce has failed to establish a triable basis for Eighth Amendment liability with regard to four sudden, unexpected fights over the course of a year at the maximum security prison Stateville. Viewing the facts and reasonable inferences in Boyce's favor, the evidence does not suggest any significant sign or risk of danger, let alone a danger so pervasive as to render Defendants liable for these random attacks. The Court therefore grants the IDOC Defendants' summary judgment motion in its entirety.

## II. Wexford Defendants and Defendant Duvall —Deliberate Indifference to Medical Needs

### A. Exhaustion

First, the Wexford Defendants have met their burden in establishing that Boyce failed to exhaust his administrative remedies prior to filing suit. *See* 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002); *King v. McCarthy*, 781 F.3d 889, 893 (7th Cir. 2015). To exhaust administrative remedies, a prisoner "must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002); *see also King,* 781 F.3d at 893 ("A prisoner must comply with the specific

procedures and deadlines established by the prison's policy.")   In Illinois, an inmate must submit a grievance within sixty days after he discovers an alleged problem.   *See* 20 Ill. Admin. Code § 504.810(a); *Roberts v. Neal*, 745 F.3d 232, 235 (7th Cir. 2014).   Also, an inmate in Illinois begins the exhaustion process by speaking with a counselor.   *See* 20 Ill. Admin. Code § 504.810(a); *Macon v. Mahone,* 590 Fed. App'x 609, 611 (7th Cir. 2014); *Tullis v. Shaw*, No. 14-CV-00070-JPG, 2014 WL 3809497, at *3 n.1 (S.D. Ill. Aug. 1, 2014).   If the problem remains unresolved, the inmate must appeal to the Grievance Officer, who submits a recommendation to the warden, the facility's chief administrative officer ("CAO").   *See Roberts v. Neal*, 745 F.3d at 235; *Tullis*, 2014 WL 3809497, at *3 n.1 (citing 20 Ill. Admin. Code § 504.830(d)).   If the inmate is dissatisfied with the response from the CAO, he must appeal to the Administrative Review Board ("ARB").   *See* 20 Ill. Admin. Code § 504.850(a); *Roberts,* 745 F.3d at 235; *Tullis,* 2014 WL 3809497, at *3 n.1.

Alternatively, an inmate may request that a grievance be handled as an emergency by forwarding it directly to the CAO.   *See* 20 Ill. Admin. Code § 504.840; *Roberts,* 745 F.3d at 236; *Fletcher v. Menard Corr. Ctr.,* 623 F.3d 1171, 1174 (7th Cir. 2010).   If the CAO determines there is a substantial risk of imminent personal injury or other serious or irreparable harm exists, the CAO "shall expedite processing of the grievance and respond to the offender, indicating what action shall be or has been taken."   20 Ill. Admin. Code § 504.840(b).   If the CAO declines to treat the grievance as an emergency matter, the inmate may appeal to the ARB.   *See* 20 Ill. Admin. Code § 504.850(a).

Here, there is no evidence in the record that Boyce finalized the grievance process in connection with any of his grievances at issue in this lawsuit.   Whether or not Boyce submitted all of the grievances attached to his Second Amended Complaint, the ARB has no record of any

appeals relating to those grievances (except for certain appeals that the ARB returned with directions to provide a copy of the grievance and the warden's response). Meanwhile, in response to the Wexford Defendants' summary judgment motion, Boyce makes several conflicting arguments: (1) he claims that he did, in fact, file grievances concerning each issue raised in his Second Amended Complaint, and that he did appeal each grievance to the Administrative Review Board; (2) he asserts that his counselor refused to process his grievances, thereby preventing him from pursuing administrative procedures; and (3) he contends that prison officials hindered his grievances by regularly confiscating his legal paperwork. *See* Boyce's "Opposition Declaration" (R. 177), ¶¶ 36-39. Boyce, however, acknowledges his failure to exhaust by arguing that the Court should have permitted him to voluntarily dismiss his lawsuit so that he could pursue administrative remedies as required. *See* Boyce's Motion to Alter or Amend Judgment (R. 216), ¶ 5.

That being said, whether Boyce submitted grievances at the institutional level, he has not presented competent evidence that he appealed his grievances and emergency grievances to the ARB. In the absence of any evidence to the contrary, Boyce has failed to exhaust administrative remedies prior to bringing this federal lawsuit. Consequently, the Court grants the Wexford Defendants' motion for summary judgment on the basis of non-exhaustion.

### B.    Merits Determination

While satisfied that Boyce has failed to exhaust his administrative remedies prior to bringing this lawsuit, the Court, for the sake of completeness, turns to the merits of his medical deliberate indifference claims. Correctional officials and health care providers may not act with deliberate indifference to an inmate's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Pittman ex rel. Hamilton v. Cnty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

Like failure-to-protect claims, medical deliberate indifference claims have an objective and a subjective element, namely, the inmate must have an objectively serious medical condition, and the defendant must be subjectively aware of and consciously disregard the inmate's medical need. *Farmer*, 511 U.S. at 837; *Rice*, 675 F.3d at 689.

A medical need is objectively serious when "the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). With respect to the subjective component of the deliberate indifference test, a plaintiff must show that the defendant in question was aware of and consciously disregarded his medical need. *See Farmer*, 511 U.S. at 837; *Estelle*, 429 U.S. at 103-04. "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).

According to the Supreme Court, deliberate indifference is comparable to criminal recklessness. *See Farmer*, 511 U.S. at 837. It encompasses conduct such as the refusal to provide effective treatment, *see Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011), or erroneous treatment based on a substantial departure from accepted medical judgment, practice, or standards, *see Roe*, 631 F.3d at 857. Neither medical malpractice nor a mere disagreement with a doctor's medical judgment, however, amounts to deliberate indifference. *See Holloway*, 700 F.3d at 1073; *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011); *see also King*, 680 F.3d at 1018 ("Negligence—even gross negligence—is insufficient to meet this standard"). Courts generally defer to doctors' treatment decisions "unless no minimally competent professional would have acted similarly." *Petties v. Carter*, 795 F.3d 688, 692 (7th Cir. 2015) (per curiam).

Prisoners are entitled to "adequate medical care," not "unqualified access to healthcare." *Holloway*, 700 F.3d at 1073 (internal quotations omitted). There is no single appropriate way to practice medicine in prison. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Thus, medical professionals may choose from "a range of acceptable courses based on prevailing standards in the field." *Id.* Only treatment decisions that are "'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment" can support a finding of deliberate indifference. *Holloway*, 700 F.3d at 1073 (citation omitted). In weighing deliberate indifference claims, the Court examines the totality of the medical care provided. *See Petties,* 795 F.3d at 692; *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000).

To give context to Boyce's medical care claims, the Court turns to the process by which Stateville medical professionals provide medical treatment to inmates. If an inmate at Stateville wants medical attention for a "non-emergent" condition, he must submit a written sick call request to the health care unit. (IDOC Defts' Stmt. Facts, ¶ 83; Wexford Defts' Stmt. Facts, ¶ 9.) The inmate may place a medical request slip in a box located in the cell house. (Wexford Defts' Stmt. Facts, ¶ 9.) In the alternative, inmates may make their medical needs known to the medical technicians who make their daily rounds in the cell houses. (*Id.*) The nursing staff picks up the request forms from the boxes in the living units. (IDOC Defts' Stmt. Facts, ¶ 84.) The nursing supervisor then sorts and logs requests by unit, placing the requests in marked envelopes located in the emergency room. (*Id.*) Certified medical technicians review and complete the forms and document them in the Sick Call Logbook. (*Id.*) Correctional counselors do not handle or review the sick call request slips. (*Id.*, ¶ 85.) Defendant Duvall, as a correctional officer, is not a medical professional and does not provide medical treatment to inmates. (*Id.*, ¶ 86.) Moreover,

Dr. Obaisi does not personally review written requests for medical attention. (Wexford Defts' Stmt. Facts, ¶ 10.) Rather, medical technicians and administrative personnel screen the medical requests and determine what action, if any, is needed. (*Id.*) In the case of an emergency, IDOC correctional personnel are responsible for bringing the matter to the attention of Stateville's medical staff. (*Id.*, ¶ 12.)

### 1. Personal Involvement of Halloran and Hale

Wexford Chairman Kevin Halloran and former CEO Mark Hale are entitled to summary judgment as to each incident where Boyce alleges a denial of medical care. Although Boyce dropped his claims against Wexford itself in his Second Amended Complaint, the case law governing corporate liability is instructive. In analyzing a § 1983 claim against a private corporation, the courts use the same principles applied in examining claims against a municipality. *See Perez v. Fenoglio*, 792 F.3d 768, 780 (7th Cir. 2015) ("In this circuit, a private corporation cannot be held liable under § 1983 unless it maintained an unconstitutional policy or custom."). In the case at bar, Boyce has not set forth any evidence suggesting an inadequate treatment "policy" on the part of Wexford or its administrators.

Like IDOC Director Godinez, Wexford officers Hale and Halloran have no personal involvement in individual inmate medical care. *See Kuhn,* 678 F.3d at 555-56 ("§ 1983 liability is premised on the wrongdoer's personal responsibility."). Furthermore, supervisory officials are generally shielded from liability where, as here, a plaintiff was receiving ongoing care from health care professionals. *See, e.g., Johnson v. Snyder*, 444 F.3d 579, 586 (7th Cir. 2006) (fact that plaintiff's medical needs were being addressed by the medical staff insulated the warden from liability). Indeed, it is well-settled that "[t]he Superintendent of Prisons and the Warden of each prison, [are] entitled to relegate to the prison's medical staff the provision of good medical care."

*Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009).   Even though Boyce was dissatisfied with the quality of his medical care, he does not dispute that he received medical attention following each fight or assault and, under the circumstances, Wexford officials may depend on the health care staff at each facility to assess an inmate's needs and to provide appropriate care and treatment. The Court therefore grants summary judgment in favor of Defendants Hale and Halloran as to all of Boyce's medical care claims.

### 2.     Medical Care Following Incident of March 15, 2013 (against Obaisi)

The record fails to support a reasonable inference that Defendant Obaisi acted with deliberate indifference to Boyce's serious medical needs following his March 2013 fight with Adorno.   *See Holloway,* 700 F.3d at 1073 ("For a medical professional to be held liable under the deliberate indifference standard, he must make a decision that is 'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'") (citation omitted).   In other words, the record shows that Dr. Obaisi did not disregard Boyce's serious injuries because he provided Boyce meaningful treatment after the March 2013 incident, especially in light of the totality of the medical care provided Boyce.   *See Petties*, 795 F.3d at 692, 697.

In particular, on the same day as the fight, the nurse who examined Boyce immediately after the incident noted small bumps and bruises to his head.   The medical staff administered a saline IV and gave Boyce Tylenol.   They also admitted Boyce to the infirmary for 23-hour observation where the nurses regularly checked him.   Later that same morning, Dr. Obaisi examined Boyce, at which time Boyce did not voice any complaints.   The next day, Dr. Obaisi performed physical and neurological examinations.   Dr. Obaisi found Boyce "asymptomatic" and concluded that there were no neurological abnormalities.   Further, Dr. Obaisi's physical

33

examination revealed only minor bruising on Boyce's forehead and cheeks. In addition, Dr. Obaisi referred Boyce to a dentist and instructed that he undergo a follow-up examination. Four days later, a prison dentist extracted a tooth, and a physician's assistant conducted a follow-up exam. Because Boyce complained of blurred vision at the follow-up visit, the physician's assistant additionally scheduled him to see an optometrist.

Despite this comprehensive treatment, Boyce argues that he received deficient medical care, yet he does not identify a single medical need that went unaddressed nor has he described a single action or omission on the part of Dr. Obaisi that reflected "a substantial departure" from accepted professional protocol. *See Holloway*, 700 F.3d at 1073. Boyce contends that he should have received stronger pain medication than Tylenol, but he also insists that he would never, in any case, take a narcotic because his mother was addicted to drugs. (Wexford Defts' Stmt. Facts, ¶ 65; Boyce Dep., pp. 162-63.) Boyce's unsupported legal conclusion that his medical care was somehow inadequate is insufficient to defeat Defendants' motion for summary judgment regarding the medical treatment following his March 2013 fight with Adorno.

### 3.    Medical Care Following Incident of November 28, 2013 (Obaisi and Duvall)

Next, Boyce argues that the health care unit's failure to conduct a follow-up examination after his physical altercation with Williams and Boyd on November 28, 2013 violated his constitutional rights. Boyce, however, concedes that Dr. Obaisi did not provide medical care following that incident. The facts, viewed in favor of Boyce, reveal that Dr. Obaisi had seen Boyce earlier in that month regarding medical complaints unrelated to this lawsuit, however, Dr. Obaisi did not treat Boyce following the November 2013 altercation. Although Boyce recalls that he saw Dr. Obaisi only "in passing" in or around December 2013, he has failed to establish a link between Dr. Obaisi and the health care unit's purported failure to call him back for a follow-up

examination.   Therefore, Dr. Obaisi is entitled to judgment as a matter of law on this claim based on his non-involvement.   *See Perez,* 792 F.3d at 781-82.

As a correctional counselor, Duvall is not a medical professional and does not provide medical treatment to inmates.   Further, correctional officers at Stateville do not review sick call requests, although in a case of an emergency, IDOC correctional personnel are responsible for bringing the matter to the attention of the medical staff.   Here, Boyce complains that he told Duvall that he wanted a follow-up appointment after his initial treatment on November 28, 2013. To recap, the nurse who performed a physical examination the day of the incident found only minor bumps and bruises on Boyce's shoulder and lower back.   Further, the nurse determined that nothing more than Tylenol and Ibuprofen for pain was warranted.   Likewise, a nurse who examined Boyce the next day indicated that he needed a lower dose of pain medication.

As a non-medical defendant, Duvall is allowed to "rely on the expertise of medical personnel," namely, "if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."   *Arnett*, 658 F.3d at 755; *see also McGee v. Adams,* 721 F.3d 474, 483 (7th Cir. 2013).   A non-medical defendant, however, can be held liable for deliberate indifference if he has a reason to believe—or actual knowledge—that prison medical staff are mistreating or not treating an inmate.   *See Arnett,* 658 F.3d at 755.

Here, Boyce bases his deliberate indifference claim on the fact that Duvall failed to help him schedule a follow-up appointment after he was treated for minor injuries in November 2013. This is not a case where the medical staff mistreated an inmate or failed to provide any treatment. *See King,* 680 F.3d at 1018.   Instead, reviewing his claim within the totality of the medical care provided after this incident, the Court would be hard-pressed to conclude that the medical staff's

treatment was a substantial departure from accepted professional judgment, let alone negligent. *See Pyles,* 771 F.3d at 409. Under these circumstances, that Duvall did not assist Boyce in scheduling a follow-up appointment does not constituted deliberate indifference to his medical needs, especially in light of Stateville's procedures in communicating with inmates about their medical needs, including medical technicians making daily rounds in the cell houses.

### 4. Medical Care Following Incident of January 3, 2014 (against Obaisi)

The Court assumes for this claim that Boyce's injuries on January 3, 2014, which necessitated his hospitalization, qualify as "serious." Construing the facts and reasonable inferences in Boyce's favor, Defendants have demonstrated that the health care staff provided ample care when fellow inmates attacked Boyce in the shower room on January 3, 2014. Moreover, Dr. Obaisi was completely uninvolved in that care and treatment, no matter how unsatisfactory Boyce found it.

Instead, Stateville physician Dr. Davis supervised Boyce's medical care following the shower-room assault. Dr. Davis admitted Boyce to the infirmary, where he spent six days. Dr. Davis provided Boyce with ice, she prescribed pain medication, she referred Boyce for a dental evaluation, and she examined him again when he returned from the dentist. While in the prison hospital, it is undisputed that Boyce was hooked up to an IV, and the nursing staff closely monitored his condition. The health care staff took x-rays to make sure Boyce had sustained no fractures and authorized a three day lay-in following his discharge from the infirmary. Over the next several days, Dr. Davis prescribed Tylenol, Naproxen, and Orabase, extended Boyce's lay-in permit, and ordered additional x-rays when Boyce complained of hip pain.

Boyce has failed to present sufficient evidence showing a genuine dispute for trial that the health care providers—whether Defendants or non-Defendants—acted with deliberate

indifference to his serious medical needs based on the totality of the medical care provided after the January 2014 shower attack. *See Petties,* 795 F.3d at 692. In other words, there is nothing in the record suggesting that the medical staff did anything but provide medical treatment reflecting professional judgment and practices. *See Pyles,* 771 F.3d at 409 ("The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment."). The Court grants the Wexford Defendants' summary judgment motion regarding the medical care attendant to the January 2014 incident.

**5.    Medical Care Following Incident of February 13, 2014 (against Obaisi)**

Next, Boyce argues that his sore hip was further injured by his cellmate Sutherland charging at him, after which Boyce jumped out of the way. Following this February 2014 incident with Sutherland, a nurse examined Boyce and prescribed Ibuprofen, advising Boyce to continue taking his previously prescribed pain medication. The next day, Boyce had a follow-up visit in the health care unit at "nurse sick call." The nurse who examined Boyce provided him with a lower dosage of Ibuprofen than the day before. Also, the nurse scheduled Boyce for a follow-up appointment with a physician on February 26, 2014, however, IDOC transferred Boyce from Stateville to Pontiac Correctional Center on that day.

Assuming that Boyce's injured hip rises to the level of a serious medical condition, it is undisputed that Dr. Obaisi had no involvement in the care Boyce received following the Sutherland episode. Accordingly, any claim against Dr. Obaisi must fail. Moreover, Boyce does not sufficiently explain how his medical treatment following the February 2014 incident was "a substantial departure" from accepted professional protocol. *See Holloway*, 700 F.3d at 1073.

Without more, Boyce's deliberate indifference claim based on his February 2014 treatment does not survive summary judgment.

### 6.    Discrimination Claim (against Obaisi)

Last, Boyce contends that Dr. Obaisi denied him medical care because he is an American and a non-Muslim.   As discussed in detail above, Boyce has failed to present evidence raising a material dispute for trial that that Dr. Obaisi denied him necessary medical treatment at all, let alone for discriminatory reasons.   If Dr. Obaisi expressed anti-Christian and anti-American sentiment to Boyce, as Boyce claims, then his remarks were inappropriate and unprofessional. Boyce, however, has not made a triable showing that Dr. Obaisi singled him out to withhold medical treatment on the basis any impermissible animus.   The Court therefore grants Defendants' summary judgment motion in this respect.

### CONCLUSION

For all of the foregoing reasons, the Court concludes that Defendants are entitled to judgment as a matter of law on each of Boyce's deliberate indifference claims.   Moreover, the Wexford Defendants have demonstrated that Boyce failed to exhaust administrative remedies prior to bringing suit.   Regardless, even viewing the summary judgment record in the light most favorable to Boyce, no reasonable trier of fact could find that any of the Defendants acted with deliberate indifference to Boyce's safety or medical needs.

If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment.   *See* Fed. R. App. P. 4(a)(1).   If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome.   *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998).   If the appeal is found to be non-meritorious, the Court of Appeals could assess a "strike" under 28 U.S.C. § 1915(g).   If a prisoner

accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he or she is in imminent danger of serious physical injury. *Id.* If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1).

Plaintiff need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. If Plaintiff wishes the Court to reconsider its judgment, however, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Boyce must file any Rule 59(e) motion within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The Court cannot extend the time to file a motion pursuant to Rule 59(e). *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Court rules upon the Rule 59(e) motion. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Boyce must file any Rule 60(b) motion within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must file the motion no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The Court cannot extend the time to file a Rule 60(b) motion. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Court rules on the Rule 60(b) motion only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

The Court grants Wexford Defendants' motion for summary judgment [151] and the IDOC Defendants' motion for summary judgment [160]. The Court directs the Clerk to enter final judgment pursuant to Fed. R. Civ. P. 58. The Court strikes the status hearing scheduled for September 23, 2015.

**Dated:** September 16, 2015

ENTERED

**AMY J. ST. EVE**
**United States District Court Judge**